Opinion filed May 2, 2013



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00140-CR
_____

**DEBORAH LORRAINE TERRY A/K/A DEBORAH LORRAINE REED A/K/A DEBORAH LORRAINE AIKMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Erath County Court at Law**

**Erath County, Texas**

**Trial Court Cause No. 41,954**

## MEMORANDUM OPINION

The jury found Appellant, Deborah Lorraine Terry a/k/a Deborah Lorraine Reed a/k/a Deborah Lorraine Aikman,[1] guilty of the misdemeanor offense of cruelty to livestock animals and assessed punishment at one year in jail and a $1,500 fine, but recommended community supervision. The trial court sentenced

---

[1]We note that the reporter's record refers to Appellant as Devorah Aikman throughout.

Appellant to one year in jail, but suspended the imposition of the sentence and ordered Appellant to complete two years of community supervision and pay the $1,500 fine. In her sole issue on appeal, Appellant challenges the sufficiency of the evidence to support the jury finding that she intentionally or knowingly committed the charged offense. We affirm.

*I. Background*

Officers in the Stephenville Police Department and the Erath County Sheriff's Department separately received complaints on the welfare of approximately eleven horses owned by Appellant. Charles Allen contacted Deputy Larry Cox of the Erath County Sheriff's Department regarding horses that were being kept on ten acres behind the Bosque River Apartments in Stephenville. Allen, a horse trainer, was looking for a suitable rental property to stable horses in Erath County. Allen testified that the property smelled "like . . . a pig pen" and that the conditions were terrible. He stated that the horses were stabled in small muddy pens and that the only food he saw was an old bale of hay about fifty yards from the pens. The hay was being covered by feed sacks.

Officer Scott Whitely worked in the animal control department of the Stephenville Police Department. Officer Whitely investigated a report that there were some horses behind the Bosque River Apartments that were not being cared for properly. Officer Whitely testified that the property had a "bad stench" and that two stud horses—Fleet Bob and Commitment—were standing in deep mud and manure with no feed or hay. Officer Whitely recalled that the available drinking water was dark with bits of hay stuck in it and visible mosquito larvae. The two stud horses had prominent backbones, visible ribs, and rotted hooves and were wild and unsocial. Based on Officer Whitely's observations and Allen's statement to Deputy Cox, the police obtained a warrant to seize the horses. Officer Whitely identified Appellant as the owner of the horses. Nine of the eleven

2

horses were later returned to Appellant; Fleet Bob and Commitment were sold at auction.

Bob Waldron is a veterinarian at the Animal Health and Medical Center in Stephenville. Dr. Waldron examined the eleven seized horses for their general body condition. He said that nine of the horses had satisfactory body conditions and were not starving. He found that Fleet Bob and Commitment were emaciated with little muscle mass on the rump, no fat covering on their bodies, and easily visible ribs and vertebrae. Dr. Waldron stated that Fleet Bob's and Commitment's condition would have worsened gradually over several weeks or months and that their condition could not have deteriorated to that level in less than two weeks. Dr. Waldron testified that, while it is possible for an older horse to be underweight even with very good care, the condition of the two stud horses was not the result of age. Fleet Bob was a relatively young thoroughbred horse, while Commitment was middle-aged. Dr. Waldron opined that their condition was the result of either "malnutrition or extreme environmental stresses that led to malnutrition." Dr. Waldron elaborated that standing in mud or water for long periods of time can lead to infections in the hooves, legs, and skin of a horse and that standing water or mud is a breeding ground for flies, which further irritate the horses.

Tandi Rider housed Appellant's eleven horses following the seizure. She kept Fleet Bob and Commitment from the July seizure until the auction in September, during which both horses gained weight. When the stud horses first arrived, they were very malnourished and underweight and had sore feet. Rider stated that the two stud horses were so "glossy eyed" that they did not fight even though they were stabled in relatively close quarters for stallions. She stated that Commitment was around fifteen years old, that Fleet Bob was younger, and that neither horse appeared to have any illnesses aside from a lack of food and care. Appellant never sent her veterinarian to inspect the horses, never sent any feed, and

did not provide any care for the stud horses during their stay at Rider's ranch. Rider testified that she had been a part of the horse industry her entire life but that she had never before dealt with horses in such bad physical condition as Fleet Bob and Commitment.

In her defense, Appellant stated that, one month prior to the seizure, she moved to Houston for work; however, she and her family returned to Stephenville every two weeks to check on her horses. She hired Donna Kreitz to care for the horses while she was away and purchased feed, hay, and watering hoses for Donna to use. Before her family's move to Houston, Appellant cared for the horses. Appellant testified that she owned and was responsible for the eleven seized horses but that she purchased Commitment on an installment contract and was behind on the payments. Appellant stated that, when she left for Houston, Commitment had "gut problems" and was underweight due to those issues, but was not emaciated.

Appellant's husband, Jerry Aikman, testified on her behalf. Jerry said that, before the family moved to Houston, Fleet Bob and Commitment were "a little underweight," but otherwise were doing well. Jerry saw the two stud horses two weeks prior to the seizure when Appellant and he drove back to Stephenville to check on the horses. When he saw the horses after the seizure, two weeks after his last return to Stephenville, Commitment was in "bad shape," and it did not appear to him that Donna had fed the animals. Jerry testified that he found 200 pounds of unused feed after the seizure. Jerry further stated that the dirty water that the police referred to was rain water that had collected in a wheelbarrow and was not the horses' water supply.

Appellant also called Rhett Harrison and Sam Taylor as witnesses. Harrison rented property near Gorman, Texas, to Appellant for pasturing some of her horses. His property was not involved in the seizure of the horses. Harrison testified that he stopped by his property every few days and that the horses at that location

4

appeared to be in reasonably good shape. Harrison admitted that a few of the horses looked "old" and "wormy." Several years before, Taylor housed his horses at a stable managed by Appellant. He noticed no neglected animals, but Taylor saw an aged and underweight stallion. After Appellant moved to the property behind the Bosque River Apartments, Taylor saw the mares, which appeared to be in good condition in the front pasture, but he could not see the pens where Appellant kept the stud horses.

## II. Sufficiency of the Evidence

Appellant argues that the evidence is insufficient to establish the elements of the offense of cruelty to livestock animals. We review a sufficiency of the evidence issue under the standard of review in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The jury may make reasonable inferences from the evidence and can rely on both circumstantial and direct evidence in its determination. *Hooper v. State*, 214 S.W.3d 9, 14–16 (Tex. Crim. App. 2007). We defer to the jury's role as the sole judge of witnesses' credibility and the weight their testimony is afforded. *Brooks*, 323 S.W.3d at 899.

The State charged Appellant with cruelty to livestock animals under Section 42.09 of the Texas Penal Code. Section 42.09 provides that a person commits the offense by knowingly or intentionally failing to provide food, water, or care necessary to maintain good health for a livestock animal in the person's custody. TEX. PENAL CODE ANN. § 42.09(a)(2), (b)(6) (West 2011). Horses are livestock animals. *Id.* § 42.09(b)(5)(B).

Appellant argues that there is insufficient evidence to establish that she knowingly or intentionally committed the offense. A person acts intentionally when the person has a conscious objective or desire to engage in the conduct or cause the result; a person acts knowingly when she is aware of the nature of her conduct or that the circumstances exist. TEX. PENAL CODE ANN. § 6.03(a), (b) (West 2011). Although Appellant maintains that no evidence of intent or knowledge exists, a jury may infer a culpable mental state from circumstantial evidence, including the acts, words, and conduct of Appellant. *Martinez v. State*, 48 S.W.3d 273, 276 (Tex. App.—San Antonio 2001, pet. ref'd) (citing *Pine v. State*, 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd)).

Dr. Waldron testified that it would take longer than two weeks for the horses' condition to deteriorate to the state they were in when he examined them. Appellant and Jerry testified that they last saw the horses two weeks before the State seized the horses. Appellant admitted that, prior to her move to Houston, she was the caretaker of her horses and that she left for Houston roughly one month before the State seized the horses. When the State cross-examined Appellant, she said that Donna, Appellant's hired caretaker, was a truck driver and was out of town on truck runs during the week. Appellant also testified to her monthly income and her monthly expenses; she testified that she "could not afford to feed 11 horses." The jury heard Appellant say, "I've been doing it [horse care] for so many years that I haven't changed one thing since you took my horses and stole them from me."

Here, the evidence indicates a long period of deprivation and neglect. The State introduced photographs of the two horses when they were seized and photographs of the same horses after six weeks in Rider's care; the "after" photographs showed that the horses were no longer emaciated. Presented with evidence of Fleet Bob's and Commitment's physical condition and with the

6

testimony that Appellant saw the horses two weeks prior to the seizure and was the primary caretaker until one month before seizure, a jury could easily infer intent or knowledge. We hold that the evidence, when viewed in the light most favorable to the verdict, supports the jury's verdict that Appellant knowingly or intentionally deprived the horses of necessary food, water, and care. "The quantity and quality of food necessary to sustain a horse is a matter of common knowledge among persons familiar with the care of horses." *Cross v. State*, 646 S.W.2d 514, 515–16 (Tex. App.—Dallas 1982, pet. ref'd). As the factfinder, the jury could have rationally determined that Appellant knew of the malnourishment.

Appellant attempts to distinguish the facts of her case from those in *Pine*. *Pine*, 889 S.W.2d 625. In *Pine*, the defendant was found guilty of cruelty to livestock animals for failing to provide necessary food, water, and care to a colt. *Id.* at 627. Similar to this case, Pine hired someone to feed and care for the colt. *Id.* at 629–30. Appellant argues that *Pine* is in direct contrast to her case because Pine was on the property every day, whereas she was "hundreds of miles away." A closer reading of the *Pine* opinion reveals that Pine testified he only saw the colt every two to three weeks and paid someone to feed and care for the colt daily. *Id.* at 630. *Pine* is analogous to the facts of Appellant's case.

We have reviewed all of the evidence in the light most favorable to the verdict, and we determine that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We overrule Appellant's sole issue on appeal.

### III. This Court's Ruling

We affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE


May 2, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.